UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.                                                    Criminal No. 2:13cr156

W. WAYNE PERRY, JR.,

             Defendant.

## MEMORANDUM ORDER

This matter is before the Court on two motions for a new trial filed by criminal defendant W. Wayne Perry ("Defendant"), ECF Nos. 170, 172, as well as a renewed Motion for Judgment of Acquittal, ECF No. 173. The United States of America (the "Government") has filed a consolidated brief in response to Defendant's motions. Defendant thereafter filed a consolidated reply brief, and all motions are therefore ripe for review.

After careful consideration of the parties' submissions, for the reasons set forth below, supplemented by the reasons stated on the record at trial, the Court **DENIES** each of Defendant's motions.

### I. Procedural Background

On February 5, 2014, a federal grand jury returned an eighteen count superseding indictment charging Defendant with various health care fraud felony offenses, as well as alteration

of records and aggravated identity theft felony offenses.    On
September 16, 2014, at the conclusion of a three week jury
trial, the jury returned a verdict finding Defendant guilty as
to all eighteen counts.    Defendant has since filed the three
motions identified above, two of which seek a new trial on
certain specified counts, with the third seeking a judgment of
acquittal or, alternatively, a new trial based on the
sufficiency of the evidence.    Each motion is addressed
separately below.

## II. Standard of Review

### A. New Trial

Rule 33 of the Federal Rules of Criminal Procedure provides
that, "[u]pon the defendant's motion, the court may vacate any
judgment and grant a new trial if the interest of justice so
requires."   Fed. R. Crim. P. 33(a).    The Fourth Circuit has
observed that "a court should exercise its discretion to grant a
new trial sparingly." United States v. Perry, 335 F.3d 316, 320
(4th Cir. 2003) (internal quotation marks and citation omitted).
Moreover, when a "motion for a new trial [i]s premised on an
instructional error to which [the defendant] did not object . .
. a district court should deny a motion for a new trial in the
absence of plain error." United States v. Sprouse, 517 F. App'x
199, 204 (4th Cir. 2013) (citing Fed. R. Crim. P. 52(b)).    The
United States Supreme Court has interpreted the "plain error"

standard as having four criteria: "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the [defendant's] substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" United States v. Marcus, 560 U.S. 258, 262 (2010) (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)).

## B. Judgment of Acquittal

Federal Rule of Criminal Procedure 29 allows a district court to enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A court must sustain a jury's guilty verdict in a criminal case "'if there is substantial evidence, taking the view most favorable to the Government, to support it.'" United States v. Cameron, 573 F.3d 179, 183 (4th Cir. 2009) (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). "'[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" Id. (quoting Burgos, 94 F.3d at 862). "The jury, not the reviewing court, assesses the credibility of

3

witnesses and resolves any conflicts in the evidence presented."
United States v. Lentz, 383 F.3d 191, 199 (4th Cir. 2004).

## III. Discussion

### A. ECF No. 172

Defendant seeks a new trial on Counts Two through Thirteen of the superseding indictment based on the assertion that the Court incorrectly defined the word "willfully" in its charge to the jury. For the reasons set forth below, the Court finds that a new trial is not warranted based on such claim of error.

Counts Two through Thirteen charge that Defendant "knowingly and willfully" made false or fraudulent statements in connection with a health care matter, or that Defendant "knowingly and willfully" executed a scheme or artifice to defraud a health care benefit program. 18 U.S.C. §§ 1035, 1347. Prior to trial, both the Government and Defendant separately submitted a proposed jury instruction defining "willfully" as requiring that Defendant acted with the general knowledge that his conduct was "unlawful." The Court, however, selected a jury instruction that defined "willfully" as only requiring that Defendant acted "deliberately, voluntarily, and intentionally."[1]

---

[1] This Court recently used the same instruction defining "willfully" in another health care fraud jury trial, rather than using the instruction proposed by the defendant in that case which defined "willfully" as requiring proof that the defendant deliberately violated a known legal duty. Although the Fourth Circuit concluded on appeal that this Court had "provided correct instructions regarding the necessary mens rea to support the charged offenses," United States

4

Such "baseline" mens rea requirement was previously adopted by the United States Court of Appeals for the Fourth Circuit as a proper interpretation of the word "willfully" as used in the general statute criminalizing false statements. United States v. Daughtry, 48 F.3d 829, 831-32 (4th Cir. 1995), vacated on other grounds 516 U.S. 984 (1995), reinstated in relevant part 91 F.3d 675 (1996). Although the parties in the instant case were afforded an opportunity to review and object to the Court's proposed jury instructions, neither the Government nor the Defendant objected to the instruction defining "willfully" that was selected by the Court. Such instruction is therefore subject to "plain error" review. Sprouse, 517 F. App'x at 204.

Defendant's post-trial assertion that this Court clearly erred by providing the jury a legally erroneous instruction is based on a line of cases interpreting the word "willfully" to have one of two elevated mens rea definitions. In Ratzlaf v. United States, 510 U.S. 135 (1994), the Supreme Court adopted a definition of the term "willfully" that required the government to prove not only that the defendant intentionally structured financial transactions in a manner designed to evade the requirement that the financial institution report such transactions to the Secretary of the Treasury, but that he "knew

_____

v. Poulin, 461 F. App'x 272, 286 (4th Cir. 2012), the Fourth Circuit's opinion does not specifically analyze the instruction defining the term "willfully."

the structuring he undertook was unlawful." Id. at 136-38; see

Cheek v. United States, 498 U.S. 192, 201 (1991) ("Willfulness,

as construed by our prior decisions in criminal tax cases,

requires the Government to prove that the law imposed a duty on

the defendant, that the defendant knew of this duty, and that he

voluntarily and intentionally violated that duty.") (emphasis

added). Subsequent to Ratzlaf, in Bryan v. United States, 524

U.S. 184 (1998), the Supreme Court adopted a slightly more

relaxed definition of the word "willfully" as used in a firearms

trafficking statute, requiring only that the defendant had a

generalized knowledge that his conduct was unlawful. Id. at

196. In Bryan, the Supreme Court distinguished the standard

applied in Cheek and Ratzlaf, noting that those cases involved

"highly technical statutes that presented the danger of

ensnaring individuals engaged in apparently innocent conduct."

Id. at 194.

### 1. The Instruction Given in this Case is an Accurate Statement of the Law

Guided by Ratzlaf, Bryan, and other Supreme Court and

Fourth Circuit precedent, the Fourth Circuit recently repeated

the two different heightened mens rea definitions of the word

"willfully" set forth immediately above. United States v.

Bishop, 740 F.3d 927, 934 (4th Cir. 2014). Although the Fourth

Circuit did not reject, distinguish, or otherwise discuss the

6

"baseline" mens rea requirement that was previously approved by
the Fourth Circuit in Daughtry, it did note that the definitions
of "willfully" as applied in both Ratzlaf and Bryan move away
from the "'fundamental canon of criminal law that ignorance of
the law is no excuse.'" Id. (quoting United States v. George,
386 F.3d 383, 392 (2d Cir. 2004)).  In light of the Fourth
Circuit's recognition of the fact that even the less rigorous
Bryan standard moves away from such fundamental canon,[2] it does
not appear that the Fourth Circuit's failure to discuss the
"baseline" mens rea standard is tantamount to a sweeping
rejection of such standard.  This is particularly the case
because, in Bishop, both the defendant and the government agreed
that "knowledge of an export's illegality" was necessary to
satisfy the "willfulness requirement" of the statute at issue in
that case, thus obviating the need for the Court to discuss the
potential applicability of an even lesser "baseline" mens rea
standard that only required voluntary and intentional acts.  Id.
at 932.  Moreover, the statue at issue in Bishop, similar to the
statute at issue in Bryan, criminalized willful violations of
"any provision" of the Arms Control Export Act.  22 U.S.C. §
2778(c).  In contrast, here, the statutes at issue criminalize

---

[2] The Supreme Court's opinion in Bryan states that the standard adopted
therein does not "carve out an exception" to such traditional canon,
Bryan, 524 U.S. at 196; however, the Fourth Circuit's subsequent
opinion in Bishop expressly characterizes the Bryan standard as at
least moving away from such canon.  Bishop, 740 F.3d at 934.

7

"knowingly and willfully" making false statements or "knowingly and willfully" executing a scheme to defraud, making no reference to "willfully violating" the statute itself. 18 U.S.C. §§ 1035, 1347.

Exiting the arena of illegal firearms trafficking, which was at issue in both Bryan and Bishop, and returning to the arena of federal fraud crimes, which is at issue here, the Fourth Circuit has not only previously approved of the "baseline" mens rea requirement when defining the word "willfully," but in the same opinion, expressly rejected the applicability of a heightened mens rea standard requiring proof that the defendant had knowledge that his conduct was unlawful. Daughtry, 48 F.3d at 831-32. In Daughtry, the Fourth Circuit was interpreting the mens rea phrase "knowingly and willfully" as used in 18 U.S.C. § 1001, the general false statements statute located in the same chapter as § 1035. As explained by the Fourth Circuit in Daughtry:

    The statute of conviction, 18 U.S.C. § 1001, provides: Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

8

At trial, [the defendant] requested the following instruction on willfulness: "An act is done 'wilfully' if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." The district court refused to give this instruction, and instead charged the jury that "[a]n act is done willfully if it is done deliberately and intentionally as contrasted with accidentally, carelessly or unintentionally."

. . .

We do not believe that Ratzlaf controls the definition of the term "willfully" in the context of 18 U.S.C. § 1001. In [the statute at issue in Ratzlaf], the word "willfully" modifies "violat[es]," indicating that an individual must deliberately and intentionally violate the currency structuring laws in order to be convicted. In significant contrast, in § 1001 the word "willfully" modifies, inter alia, "falsifies, conceals or covers up . . . a material fact, or makes any false, fictitious or fraudulent statements." Nothing in the language or structure of § 1001 indicates that one may violate § 1001 only by acting with knowledge of the existence of the law and an intent to violate or disregard it. See United States v. Rodriguez-Rios, 14 F.3d 1040, 1048 n.21 (5th Cir. 1994) (en banc) (dictum) ("In contrast to §§ 5322(a) and 5324, however, § 1001 does not contain any purpose requirement. Therefore, the Ratzlaf decision is inapplicable to the present case.") . . . . Moreover, defining the term "willfully" to require a knowing violation of the law would circumvent the holding of United States v. Yermian, 468 U.S. 63, 74-75, (1984), that actual knowledge of federal agency jurisdiction is not required to prove a violation of § 1001.

In addition, it is unnecessary to construe the term "willfully" in § 1001 as requiring an intentional violation of the law in order to avoid criminalizing utterly blameless conduct. . . . [T]he [Yermian] Court concluded that "[t]he jury's finding that federal agency jurisdiction was reasonably foreseeable by the defendant, combined with the requirement that the defendant had actual knowledge of the falsity of those statements, precludes the possibility that

9

criminal penalties were imposed on the basis of innocent conduct." Id. at 74, 75 n.14.

. . .

And, although [the defendant] would have us interpret the term "willfully" in such a way that one cannot violate § 1001 without knowing that it exists, we will not do violence to "the venerable principle that ignorance of the law generally is no defense to a criminal charge." Ratzlaf, 510 U.S. at 149; cf. Liparota v. United States, 471 U.S. 419, 425-27 & n.9 (1985) (construing statute criminalizing food stamp fraud to require that the defendant knew that his possession of food stamps was unauthorized, but specifically disclaiming a holding that the defendant must know that the unauthorized possession of food stamps was illegal).

Daughtry, 48 F.3d at 831-32.

As argued by Defendant, subsequent to Daughtry, the Supreme Court made the broad statement in Bryan that "[a]s a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose,'" or stated differently, that a defendant must generally act "'with knowledge that his conduct was unlawful.'" Bryan, 524 U.S. at 191 (quoting Ratzlaf, 510 U.S. at 137). However, the Supreme Court made such sweeping comment only after acknowledging that "[t]he word willfully is sometimes said to be a word of many meanings whose construction is often dependent on the context in which it appears" and that, "[m]ost obviously it differentiates between deliberate and unwitting conduct, but in the criminal law it also typically refers to a culpable state of mind." Id.

(emphasis added). In line with the Supreme Court's recognition that context is critical, the Fourth Circuit recently held in Bishop that a district court must examine the specific statute at issue in order to determine the applicable mens rea requirement because the "question is ultimately one of statutory interpretation, since 'determining the mental state required for commission of a federal crime requires . . . inference of the intent of Congress.'" Bishop, 740 F.3d at 932 (quoting Staples v. United States, 511 U.S. 600, 605 (1994)) (alteration in original). Accordingly, notwithstanding the Supreme Court's sweeping comments in Bryan regarding the "typical" meaning of the term "willfully" in the criminal context, this Court remains obligated to analyze the individual statutes at issue in this case, and thus does not read Bryan to expressly or implicitly overrule Daughtry.[3]

Prior to endeavoring to define the mental state required under § 1035 and § 1347, this Court highlights the well-reasoned analysis of United States v. George, an opinion authored subsequent to Bryan by then Second Circuit Judge Sonia Sotomayor. As explained in George, a compelling argument can be made that "[t]he significance of Cheek, Ratzlaf, and Bryan,

---

[3] As noted above, the statute being analyzed in Bryan required a "willful violation" of the statute, not a knowing and willful execution of "a scheme or artifice" to defraud, 18 U.S.C. § 1347, or a knowing and willful false or fraudulent statement. 18 U.S.C. § 1035.

. . . lies in their atypicality." George, 386 F.3d at 392. The George opinion artfully explains:

The Supreme Court's interpretations of "willfully" in Cheek, Ratzlaf, and Bryan represent a departure from the Supreme Court's seemingly principal approach to interpreting the term "willful" in criminal statutes. As reflected in Cheek and Ratzlaf, the Court has typically read "willfully" to require a purpose to violate a particular law only in those isolated circumstances where the obscurity or complexity of that particular criminal statute may prevent individuals from realizing that seemingly innocent acts are, in fact, criminal. In turn, the phrase "willfully" should not be interpreted to create unwarranted exceptions to the fundamental canon of criminal law that ignorance of the law is no excuse. . . . Thus, although a defendant's general awareness of the unlawfulness of his or her conduct may be necessary to establish the boundary between protected and unlawful conduct, Bryan's somewhat conclusory statement distinguishing "willfully" from "knowingly," such that "willfully" requires a defendant's cognizance of the generally unlawful nature of his or her action, also appears to be an atypical approach.

Id. at 392-93. As indicated above, the Fourth Circuit's recent opinion in Bishop not only favorably cites the George opinion's discussion of the "'fundamental canon of criminal law that ignorance of the law is no excuse,'" but further holds that "[e]xceptions to such a venerable rule should be construed narrowly in the absence of clear congressional intent to the contrary." Bishop, 740 F.3d at 934 (quoting George, 386 F.3d at 392)) (emphasis added).

The statute at issue in George, which is notably similar to § 1035 at issue in this case, criminalizes "willfully and

knowingly" making a false statement in a passport application with the intent to induce the issuance of a passport. In rejecting an interpretation of the word "willfully" that required an elevated mens rea beyond deliberate and intentional action, the George opinion explains:

> [T]he proper approach to applying § 1542's "willfully and knowingly" phrase is not to determine whether each individual word in the phrase has been given meaning, but to ensure that the phrase in its entirety is applied to delineate the appropriate boundary between innocent and criminal conduct. . . . To protect otherwise innocent conduct, § 1542's "willfully and knowingly" mens rea phrase needs to be construed only to proscribe false statements that are knowingly included in a passport application and need not be interpreted to modify other statutory terms. The Supreme Court adopted this approach in interpreting the "willfully and knowingly" requirement in the "use" section of § 1542. Browder v. United States, 312 U.S. 335, 342 (1941). . . . Every circuit to have addressed this issue has adopted the Eleventh Circuit's holding in United States v. O'Bryant, which incorporated Browder's interpretation of § 1542's "willfully and knowingly" term into its holding that "[t]he crime [of a § 1542 false statement violation] is complete when one makes a statement one knows is untrue to procure a passport. Good or bad motives are irrelevant." 775 F.2d 1528, 1535 (11th Cir. 1985) (citations omitted). . . .

George, 386 F.3d at 395-96. The Second Circuit therefore concluded in George that the district court's jury instruction indicating that the defendant must have acted with "a bad purpose to disobey the law" and "must have been aware of the generally unlawful nature of [his] act," an instruction similar to that proposed by the parties in this case, "while perhaps

appropriate as a definition of 'willful' in other contexts," was an incorrect statement of law as to § 1542, which "only requires a finding that the defendant knowingly made false statements in a passport application." Id. at 397-98. Although § 1542 is not at issue in the instant case, both of the fraud statutes at issue: (1) include the same "knowingly and willfully" statutory phrase; (2) are structured similarly to § 1542 in that the phrase "knowingly and willfully" immediately precedes specific prescribed acts, such as making a false statement or devising a scheme or artifice to defraud, as contrasted with preceding the broader act of "violating the statute"; and (3) criminalize conduct that appears unlikely to result in an "innocent" violation of the statute as § 1347 requires either a "scheme or artifice to defraud" a health care benefit program or a "scheme or artifice to obtain, by means of false or fraudulent pretenses" the money or property of a health care benefit program, 18 U.S.C. § 1347 (emphasis added), and § 1035 requires a knowing and willful falsification of a material matter, or a fraudulent statement, in connection with the delivery or payment of health care services, 18 U.S.C. § 1035.[4]  See United States

---

[4] Comparing the language of § 1035 to the language of § 1347, it appears that if the baseline mens rea requirement is applied to the word "willfully" in each statute, § 1035 runs a greater risk of reaching "innocent" conduct, although an individual charged with violating such statute would still be required to know that he was making a false statement as to a material matter. However, in light of the Daughtry opinion, which was favorably cited by the Fourth

v. Kelly, 368 F. App'x 194, 198 n.3 (2d Cir. 2010) ("[E]ven knowledge of general unlawfulness is unnecessary under statutes criminalizing conduct whose wrongfulness is obvious from the surrounding context." (citing George, 386 F.3d at 395)).

In summary, this Court finds that Defendant fails to demonstrate that the challenged instruction was erroneous under the law of this Circuit. Although it can be argued that Bryan casts some doubt as to the continuing validity of Daughtry, for all the reasons described above, this Court interprets Daughtry as remaining valid and controlling law.[5]   Further demonstrating

---

Circuit after the Supreme Court decided Bryan, see United States v. Hassouneh, 199 F.3d 175, 183 (4th Cir. 2000), Circuit precedent appears to foreclose the argument that a heightened mens rea requirement applies to § 1035.

[5] As noted by Defendant, the Solicitor General of the United States has recently stated in a brief before the Supreme Court that "the government has concluded that the 'willfully' element of both 18 U.S.C. § 1001 and § 1035 "requires proof that the defendant knew his conduct was unlawful." Govt's Opp'n Brief, Ajoku v. United States, available at 2014 WL 1571930, at *11 (Mar. 10, 2014). However, such statement accompanied the Solicitor General's acknowledgement that "'willfully' should be given the same meaning in Section 1001 and Section 1035." Id. Based on statutory construction, this Court agrees with the latter statement, and as indicated herein, therefore extends the "baseline" willfulness standard set forth by the Fourth Circuit in Daughtry when interpreting § 1001 to 18 U.S.C. § 1035 (as well as § 1347).   This Court disagrees with any suggestion by Defendant that the Solicitor General's recent statements about the government's shift in position on this issue should be accepted as controlling thus obviating the need for careful consideration of Circuit precedent. Cf. United States v. Danielczyk, 917 F. Supp. 2d 573, 576 (E.D. Va. 2013) (noting that, "both Defendants and the Government . . . seemed to take as a given that 'willfulness' in this case required that Defendants knowingly violate the law's specific commands, citing Ratzlaf," but that "[u]pon examination of relevant case law, however, it became clear to the Court that the question of mens rea was in fact so muddled that this Court could not simply follow that premise without further consideration") (emphasis added).

15

such point, in <u>United States v. Hassouneh</u>, 199 F.3d 175, 183
(4th Cir. 2000), a case decided after <u>Bryan</u>, the Fourth Circuit
favorably cited <u>Daughtry</u> for the proposition that, in some
criminal statutes, the term "willfully" is adequately defined to
the jury as requiring only that a defendant acted "deliberately
and intentionally, as contrasted with . . . accidentally,
carelessly or unintentional[ly]." Defendant's motion is
therefore **DENIED**.

## 2. If the Challenged Instruction was Erroneous any Error was not "Clear or Obvious"

Even assuming that the instruction given in this case was
erroneous, the Court finds that such error was not "clear or
obvious," as the state of the law on this issue is "subject to
reasonable dispute." <u>Marcus</u>, 560 U.S. at 262. As set forth
above, the inherent difficulty in defining the word "willfully"
in criminal statutes is well-established. Neither Defendant nor
the Government has cited a controlling case interpreting the
word "willfully" as used in 18 U.S.C. § 1035 or § 1347.
Moreover, notwithstanding the Supreme Court's broad statements
in <u>Bryan</u>, the <u>George</u> opinion provides a compelling analysis that
three different interpretations of the word "willfully" survive
<u>Bryan</u>. Another Judge of this Court has reached such conclusion,
relying in large part on <u>George</u>, and has described in detail the
three "levels" of mens rea that have been applied in criminal

16

cases to define the word willfully: (1) the "Highest Level of Intent: _Ratzlaf_ and _Cheek_," under which "willfulness requires the defendant to have known that he was violating a specific law"; (2) the "Intermediate Level of Intent: _Bryan_," under which a defendant must act with the general knowledge that his conduct was unlawful; and (3) the "Baseline Level of Intent: the Standard Case," under which the term "willfully" means that a defendant must have acted deliberately and voluntarily, with no additional requirement that he subjectively knew that what he was doing was unlawful. _United States v. Danielczyk_, 788 F. Supp. 2d 472, 487-89 (E.D. Va. 2011), _clarified by_ 791 F. Supp. 2d 513 (2011), _reversed on other grounds by_ 683 F.3d 611 (2012). Although the _Danielczyk_ opinion acknowledged that both the Supreme Court and the Fourth Circuit have, subsequent to _Bryan_, repeated the intermediate mens rea standard "with the intimation that it represents the general standard for willfulness in criminal law," such cases "seem[] to treat _Bryan_ as the alternative to _Ratzlaf_ and _Cheek_, when in fact _Bryan_ is an alternative, and an atypical one at that." _Id._ at 488. In a subsequent opinion in the same case, the district court reiterated its position that a three-tiered approach to interpreting the word "willfully" survives _Bryan_, to include the baseline standard which "simply requires that the defendant know what he is doing, regardless of his awareness of the law, and it

applies where conduct by its nature could not be participated in innocently." United States v. Danielczyk, 917 F. Supp. 2d 573, 577 (E.D. Va. 2013); see also United States v. Brandt, 546 F.3d 912, 916 (7th Cir. 2008) (indicating that while "[t]he Seventh Circuit has never addressed whether "willfully" under § 1001 requires proof that the defendant knew his conduct was a crime or simply that he knew his statement was false," as far as the Brandt panel was aware, "every other circuit to discuss this issue has rejected the notion that ignorance of the law negates willfulness under § 1001" (citing Daughtry along with cases from three other circuits). Based on the uncertain nature of the law, even if the instruction given in this case was erroneous, such error is not "clear or obvious," and Defendant's motion is therefore alternatively **DENIED** on this basis.

### 3. Even if the Instruction is Obviously Erroneous, Defendant's Substantial Rights were not Prejudiced

Alternatively, based on the trial evidence, and for the reasons argued in the Government's brief, ECF No. 176, at 6-9, this Court would conclude that even if the jury instruction defining "willfully" was obviously in error, a new trial is not warranted because the error did not affect Defendant's substantial rights. First, in viewing the instructions as a whole, it is clear that the jury's verdict was based on a finding that Defendant was guilty of acts that he committed

knowing them to be unlawful. See Noel v. Artson, 641 F.3d 580, 586 (4th Cir. 2011) (indicating that it is "easy enough to pick at words, phrases, and sentences in a [jury] charge, but that overlooks the fact that the charge in its totality was what the jury heard."). With respect to Counts Two through Five, the jury was instructed that in order to find Defendant guilty, they must conclude that he acted "with the intent to defraud." Instruction 54. "Intent to Defraud" was further defined as acting "with the intention or the purpose to deceive or to cheat," and in the context of this case, the entity being "cheated" was Medicaid.[6] Instruction 56. With respect to Counts Six through Thirteen, the jury was instructed that in order to find Defendant guilty, they must conclude that he "deliberately and purposefully" made a "materially false, fictitious and fraudulent statement" in connection with health care services and that such statement involved a health care benefit program. Instruction No. 27, 61. "False and Fictitious or Fraudulent Statements or Representations" were further defined to the jury as a statement or representation that is "untrue when made or when used and which is known by the person making it or using it to be untrue" or a statement "known to be untrue and which is made or used with the intent to deceive." Instruction No. 63.

---

[6] For simplicity, the term "Medicaid" is used herein and includes within it the Department of Medical Assistance Services (DMAS), which is the state agency that administers Virginia's Medicaid program.

Again, in the context of this case, the charged false statements were being made to Medicaid for the purpose of obtaining monetary compensation from the Medicaid program.

In addition to the above instructions on the law, the Court gave a "Good Faith Defense" instruction, stating that good faith was a "complete defense" to the charges in the superseding indictment because "good faith on the part of a defendant is, simply, inconsistent with the intent to defraud or to obtain money by means of false or fraudulent pretenses, representations, or promises alleged in those charges." Instruction 35. The good faith instruction further states that "the law is written to subject to criminal punishment only those people who act knowingly and willfully with the intent to defraud" and that "good faith" encompasses "an absence of malice or ill will." Id. The instruction concludes by stating "if the evidence in the case leaves the jury with a reasonable doubt as to whether a Defendant acted with the intent to defraud or in good faith, the jury must acquit such defendant." Id. The jury instructions taken as a whole therefore demonstrate that the Defendant was convicted by the jury based on its finding that Defendant acted with malice when he made false statements to Medicaid, and defrauded Medicaid, since good faith was a

"complete defense to the charges in the superseding indictment."[7] Id.

Not only do the instructions themselves demonstrate that the jury did not convict Defendant based on conduct he believed to be lawful, but the evidence in the case demonstrates that Defendant was in fact aware that it was unlawful to make false statements and/or submissions to Medicaid in order to obtain money to which he was not entitled. The evidence before the jury demonstrated that part of Defendant's billing scheme involved billing Medicaid the maximum number of hours possible without regard to the number of hours actually worked by Defendant's employees. Additionally, the evidence demonstrated the widespread alteration and falsification of records to cover-up such fraudulent billing scheme. Moreover, Defendant testified at trial that every time he submitted a claim for payment to Medicaid, that he was certifying that the information in the claim was true, accurate and complete, and that anyone that submits untruthful information to Medicaid could be committing a federal crime. Accordingly, considering the instructions as a whole and in light of the sworn admissions of the Defendant, as well as the rest of the trial evidence, even

---

[7] A version of this instruction that was, by its terms, only applicable to certain enumerated counts was discussed during the charge conference, but the Court ultimately gave an instruction with no limitations as to which counts it covered.

if it was "clear or obvious" error to instruct the jury on the baseline mens rea definition of "willfully," a new trial would not be warranted. Notably, while the Defendant maintained his innocence at trial, he conceded he was aware that it was a crime to commit the acts that the Government was alleging that he committed. Any instructional error, therefore, did not affect Defendant's "substantial rights" as it did not "affect[] the outcome of the trial" or "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." Marcus, 560 U.S. at 262.

After consideration of the "'record in its entirety,'" this Court is confident that, even if an instructional error occurred, and even if such error was clear or obvious, "'the proceedings against the accused resulted in a fair and reliable determination of guilt.'" United States v. Whitfield, 695 F.3d 288, 305 (4th Cir. 2012) (quoting United States v. Cedelle, 89 F.3d 181, 185 (4th Cir. 1996)). The Court therefore alternatively **DENIES** Defendant's motion for a new trial because any instructional error that occurred did not affect his substantial rights.

## B. ECF No. 170

Defendant filed a separate motion seeking a new trial on Counts One, Two through Five, and Ten through Twelve of the superseding indictment, claiming that Government witnesses made

false statements about Medicaid regulations during Defendant's trial. At trial, the attorneys for both parties (and witnesses for both parties) were operating under the mistaken impression that a regulation in the Virginia Administrative Code governing "respite care" in-home health services required, until July of 2011, that a primary caregiver live in the home of the patient for whom they were caring. In reality, as Defendant highlights for the first time in his post-trial briefs, the in-home residency provision (hereinafter "residency provision") was eliminated from the Virginia regulation in 2007, years before the time period relevant to this case. ECF No. 170, at 11-13; ECF No. 171-2, at 102. The parties' mistaken belief that the residency provision existed until 2011 occurred because the Virginia Medicaid manual governing home health care providers (such as Defendant's company) was not updated to reflect the 2007 regulatory change until 2011. Accordingly, it appears that Defendant was following an outdated manual for many years, without knowledge that it was outdated. Notably, not only did multiple witnesses for the Government, in reliance on such manual, testify that the residency provision was not eliminated until July of 2011, but some of Defendant's own witnesses, and the Defendant himself, testified that such provision applied until 2011. As discussed below, notwithstanding the fact that all parties proceeded to trial under a misapprehension of a

pertinent date regarding "respite care" services, the Court **DENIES** Defendant's motion for a new trial on this ground because he fails to demonstrate that the parties' joint mistake affected his substantial rights.

A review of the superseding indictment demonstrates that Defendant was not charged with violating the in-home residency provision during 2009-2011, but instead, was charged with fraudulently billing Medicare for services that were not provided. Specifically, Counts Two through Five charge "respite care"[8] fraud through Defendant having:

> . . . submitted and caused to be submitted claims to VMAP for payment representing that Community Personal Care had provided respite services to Medicaid recipients when, in truth and fact, as the defendants knew, Community Personal Care had not actually provided such services.

> . . . instructed Community Personal Care employees to get all Medicaid recipients approved for the maximum number of hours available for respite care.

> . . . monitored weekly respite balances for each Medicaid recipient. During the last six months of the respite billing cycle, [defendants] directed Community Personal Care employees to "run the respite" and, on occasion, instructed such employees to increase respite billing to a specified amount. [Defendants] were well aware that such a practice resulted in

---

[8] Counts One through Five all charge two different species of health care fraud; one involving "personal care" services and one involving "respite care" services. In contrast, Counts Ten through Twelve charge false statements only in association with "respite care" services. As highlighted by the Government, the residency provision is wholly irrelevant as to any fraud or false statements associated with "personal care" services.

24

> substantial overbilling for respite services and, in fact, resulted in regular fraudulent overpayments.
>
> On or about the dates listed below, as charged in separate counts of this indictment as indicated, in the Eastern District of Virginia, [Defendants] for the purpose of executing the scheme and artifice, knowingly and willfully caused the following false claims, among others, to be submitted to VMAP . . . .

ECF No. 61, at 10-11 (emphasis added).[9]

Similarly, with respect to Counts Ten through Twelve, the superseding indictment does not allege that Defendant violated the residency provision for respite care services, but instead charges that he:

> knowingly and willfully did make a materially false, fictitious and fraudulent statement and representation, and make and use a materially false writing and document knowing the same to contain a materially false, fictitious and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services, in that the defendants submitted and caused to be submitted to the Virginia Medicaid program, known as the Virginia Medical Assistance Program, the following claims for health care benefit payments, each of which falsely and fraudulently represented that Community Personal Care had provided respite care services to a Medicaid recipient, when in truth and fact, as the defendants well knew, the recipient did not receive such respite care services. . . .

Id. at 14 (emphasis added).

The theory on which the Government based its "respite care" case as to both Counts One through Five and Counts Ten through

---

[9] Count One charges a conspiracy to engage in the same unlawful conduct charged in Counts Two through Five, as well as a conspiracy to commit fraud associated with "personal care" services.

Twelve was that Defendant was guilty of making false statements to Medicaid, and devising a scheme to defraud Medicaid, through submitting bills for "respite care" services that were either never provided, or provided without regard to a primary caregiver's "need for relief" as the persons listed as "primary caregivers" for the identified patients never requested or required "respite care" relief, and several did not even know about the existence of such Medicaid benefit. The fact that some of these "primary caregivers" lived in different cities from the patients that they were purportedly caring for further underscored the Government's contention that respite care services were not needed to "relieve" such out-of-town family members.[10]

The fact that the Government's theory of respite care fraud and false statements turned on the failure of the identified primary caregiver to request or need respite care assistance, rather than the non-compliance with the residency provision, is further demonstrated by comparing Counts Ten through Twelve with

---

[10] Defendant testified at trial that the purpose of respite care is for the relief of the primary caregiver, that the primary caregiver was required to provide some degree of support for the patient, and that the service provider (i.e., the Defendant and his company) had an obligation to ensure that respite care hours were being used to benefit the primary caregiver. Moreover, when the Government specifically asked Defendant about the individual patients associated with the false statements pertaining to respite care charged in Counts Ten and Eleven, the discussion focused on the identified primary caregiver never requesting respite care (and possibly not even qualifying as a primary caregiver), not whether that individual satisfied the regulatory residency provision.

26

Count Thirteen.  All such counts charge "false statements" associated with respite care services, each count involving a different patient.  Notably, unlike the false respite care statements charged in Counts Ten through Twelve, the false respite care statements charged in Count Thirteen occurred during 2012, <u>after</u> the residency provision had been updated in the Medicaid manual.  However, just like the Government's evidence on Counts Ten through Twelve, the Government proved Defendant's guilt beyond a reasonable doubt as to Count Thirteen by advancing evidence demonstrating that the primary caregiver for the patient identified in Count Thirteen <u>never requested respite care services</u> and did not need "relief," yet Medicaid had been billed for respite care services purportedly provided to such patient.

The Government's theory of the case is further illustrated by its closing argument, as the Government made the following points: (1) at the outset of its closing, the Government emphasized that a basic principle of the Medicaid program is that you cannot bill for services that were not provided, and that respite care services are intended only to give relief to a <u>primary caregiver</u> as a result of the physical burden and emotional stress of providing continuous support for their loved one; (2) that Defendant had agreed with such facts while testifying under oath; and (3) as to Counts Two, Three, Four,

27

Ten, Eleven, and Twelve,[11] the "primary care giver" <u>never</u> <u>requested respite care</u>.[12] From this Court's recollection, the Government offered no "alternative" theory of guilt based on the

---

[11] Defendant argues in his post-trial motion that a new trial should be granted as to Count Twelve because the testimony of the primary caregiver indicated that another relative also helped care for the patient identified in Count Twelve. <u>See</u> Trial Ex. 35 (identifying the Government's witness Patricia Baugh as the patient's primary caregiver). Defendant argues that because the Government failed to prove that the other family member did not request respite care services, the jury's conviction might have been improperly predicated on the regulatory residency provision. However, notwithstanding the primary caregiver's reference to a deceased cousin who had previously helped her care for the patient, similar to the analysis of Counts Ten and Eleven, because the Government introduced evidence that the primary caregiver had not requested respite care services and based its theory of guilt on the fact that respite care services were improperly provided to benefit Defendant and his company and not the one person they were designed to help-the primary caregiver-there is no basis to grant a new trial based on speculation that the jury ignored the Government's theory of guilt, ignored the Court's instruction regarding administrative regulations, and predicated its finding of guilt on the fact that the primary caregiver made a passing reference to the fact that she did not live in the home with the patient. Notably, even a cursory review of the patient file associated with Count Twelve demonstrates that "respite care" hours were repeatedly billed to Medicaid over a number of years, to include periods in 2010 and 2011 when respite hours were billed <u>on a daily</u> <u>basis</u>, and weeks where a great number of respite hours were billed, such as the <u>59 hours billed in the single week</u> listed in the superseding indictment. Such billing is in direct conflict with the testimony of the <u>primary caregiver</u> who stated under oath the she did not even know what respite care was prior to being "educated" about such Medicaid benefit sometime during 2012, long after hundreds of hours of respite care were billed to Medicaid. It is therefore clear that the jury's verdict on Count Twelve was predicated on the lone theory of guilt advanced by the Government-that the identified respite care hours billed during 2011, even if worked, were not worked in order to provide a benefit to the primary caregiver.

[12] As to Count Five, the trial evidence demonstrated that the primary caregiver did request some respite care, and thus, the Government reduced the amount of loss claimed due to fraud to adjust for the instances identified to be valid.

28

fact that several primary caregivers testified that they did not live in the home with the patient.

In addition to the above, this Court disagrees with Defendant's characterization of the parties' joint trial error as analogous to a case where the government presents "false testimony"[13] or the Court instructs the jury based on a legal theory that, as a matter of law, could not support a finding of guilt.[14] Notably, none of the Virginia regulations discussed at

---

[13] Notwithstanding the well-crafted arguments in Defendant's briefs, ECF Nos. 170, 179, Defendant has failed to demonstrate that the Government "knowingly used false testimony" to convict Defendant. Although it can be argued that the Government "should have known" the correct date of the regulatory change, such public information was just as accessible to the defense, and defense counsel likewise "should have known" of such amendment and should have cross-examined the Government's witnesses on such point, not waited until a post-trial motion to raise such matter. Moreover, even if the Court assumes that the Government's presentation of evidence in reliance on the Medicaid manual constituted "false testimony" as to when a relevant regulation was amended, for the reasons discussed below, a new trial is not warranted when "'a combing of [publicly available regulations] after the trial has disclosed [a matter] possibly useful to the defense but not likely to have changed the verdict.'" United States v. Bartko, 728 F.3d 327, 335 (4th Cir. 2013) (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)).

[14] As described herein, this case did not involve two alternative theories of guilt, one permitted by the law, and one that is "legally inadequate." See, e.g., United States v. Moye, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (indicating that "reversal is required when a case is submitted to a jury on two or more alternate theories, one of which is legally (as opposed to factually) inadequate, the jury returns a general verdict, and it is impossible to discern the basis on which the jury actually rested its verdict" (citing Yates v. United States, 354 U.S. 298, 311-12 (1957))). To the contrary, this Court expressly instructed the jury not to base its finding of guilt on the mere violation of a civil regulation. Moreover, despite Defendant's current arguments to the contrary, the Government's theory of guilt was not based on the regulation on which incorrect testimony was offered by witnesses for both parties, but instead was predicated on the fact that respite care services were falsely billed to Medicaid

trial were included in the jury instructions because they were not controlling in this case. The question for the jury was not whether Defendant failed to comply with a civil regulation, but was instead whether the Government proved beyond a reasonable doubt that Defendant violated each of the elements of the criminal statutes as set forth in 18 U.S.C. § 1035 and § 1347, which charged false statements and a fraudulent scheme to bill Medicaid for services that were not provided.

The fact that the jury was not permitted to find Defendant guilty of a crime merely because he violated a civil regulation was emphasized by the Government in both its closing and in its rebuttal argument. Near the outset of its closing argument, the Government told the jury that it wanted to be very very clear that Defendant was not on trial because he violated Medicaid regulations; rather, those regulations were only highlighted to assist the jury in determining whether Defendant had the knowledge and intent to defraud Medicaid. Similarly, during its rebuttal, the Government concluded its argument by reminding the jury that Defendant was not charged in the superseding indictment with violating Medicaid regulations, he was charged with violating the specified criminal laws.

In addition to the Government's clear statements to the jury, the Court gave a jury instruction specifically intended to

with no regard to whether the billed care was actually needed.

ensure that the jury focused not on any references to failures to comply with civil regulations, but on the superseding indictment charging that Defendant knowingly submitted false claims to Medicaid and knowingly executed a scheme to defraud Medicaid through his handling of respite care billings. The instruction stated as follows:

> You have heard testimony about, and seen evidence admitted, relative to various regulations, rules and ethical standards that govern the conduct of providers of health care benefits. [Defendants] are not charged in the superseding indictment with any violation of any of these regulations, rules or standards. They were only admitted to assist you in regard to your assessment of the Defendants' knowledge, intent and conduct in matters which may relate to the charges in the superseding indictment.

Jury Instruction 30. There is no evidence, nor any other reason in the record, suggesting that the jury disregarded the Court's clear instruction on the law.[15]

In summary, careful consideration of the details of the three weeks of trial testimony convincingly demonstrates that two types of respite care fraud occurred between 2009 and 2012: (1) hours that were never worked in a patient's home were billed to Medicaid as "respite care" in an effort to increase the

---

[15] Moreover, considering the Defendant's own sworn admission that his belief was that the residency provision was in existence until July of 2011, any evidence presented by the Government associated with whether Defendant followed or disregarded such perceived rule may still be relevant to his "knowledge, intent and conduct in matters which may relate to the charges in the superseding indictment." Jury Instruction 30.

revenues of Defendant's company;[16] and (2) hours that may have actually been worked in a patient's home were being scheduled and billed to Medicaid as "respite care" hours without any regard to whether a primary caregiver needed "relief," and/or without regard to whether a primary caregiver even existed for that patient, with such hours instead being worked at Defendant's direction in order to maximize revenue <u>regardless of whether such care was actually needed</u>.[17]   No other theory of the case was presented to the jury as to how Defendant violated the statutes charged in Counts One, Two through Five, and Ten through Twelve with respect to respite care.[18]   Although Defendant's position is arguably strongest as to Counts Three and Twelve based on the evidence specific to those counts, after

---

[16] The Court wholly rejects Defendant's contention that, because the Government did not present <u>direct evidence</u> demonstrating that Defendant personally instructed an employee in unequivocal terms to create a false timesheet reporting respite hours that were not worked, there was insufficient evidence to support a conviction on this theory.   As argued by the Government, evidence demonstrating that Defendant repeatedly directed his employees to "run the respite," when considered in conjunction with all the other evidence in this case, was sufficient to support a reasonable juror, who disbelieved the testimony of the Defendant and believed the testimony of the Government's witnesses, in concluding beyond a reasonable doubt that Defendant was instructing his employees to create and submit false timesheets even in the absence of a blatant command to do so.

[17] Such theory of guilt appears akin to a case involving a medical doctor augmenting needed medical treatment with additional procedures he knew to be <u>medically unnecessary</u> that were performed for the sole purpose of inflating his bill to Medicaid.

[18] Defense counsel's statements during closing arguments appear to demonstrate that, as to respite care services, Defendant understood that the Government was proceeding on the theories of guilt outlined herein.

32

consideration of the entire trial record, the Court finds no "reasonable likelihood" that the testimony about the residency provision could have affected the judgment of the jury. <u>See United States v. Willis</u>, 374 F. App'x 402, 404 (4th Cir. 2010) (indicating that to obtain a new trial based on false testimony, there must be a showing of both "falsity and materiality of [the] testimony," and that the materiality prong turns on whether "'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury'" (quoting <u>United States v. Augurs</u>, 427 U.S. 97, 103 (1976)). In addition to the fact that the Government's theory of guilt did not focus on the regulatory residency provision, both counsel for the Government and the Court repeatedly made it clear to the jury that Defendant was not on trial for violating a civil regulation.

Therefore, on this record, this Court concludes "beyond a reasonable doubt" that the parties' joint error as to when the Virginia regulation changed, a change that <u>Defendant himself was admittedly unaware of</u>, "did not contribute to the verdict obtained." <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967). Defendant's motion for a new trial based on the claimed introduction of "false testimony" is therefore **DENIED**.[19]

---

[19] To the extent Defendant separately argues that a new trial is warranted because attorneys for the Government made misleading

Defendant's third motion seeks a judgment of acquittal, or alternatively, a new trial, on Counts Nine through Thirteen and Fifteen through Eighteen of the superseding indictment. Such challenges renew Defendant's oral Rule 29 motions for judgment of acquittal that were made at trial. For the reasons discussed on the record at trial in denying such motions, and as set forth in the Government's brief in opposition, ECF No. 176, the Court finds that the jury's verdict is supported by sufficient evidence and that the jury's finding of guilt must be sustained. Defendant's post-trial motion for judgment of acquittal, or alternatively for a new trial, is therefore **DENIED**.

As previously noted by the Court, a large portion of this case came down to credibility, illustrated in part by the fact that, with respect to certain billings, there was unrefuted evidence that Medicaid was defrauded, leaving only questions as to who committed such fraud. Similarly, there was unrefuted evidence that patient charts were altered, leaving only questions as to whether such alterations were occurring at the direction of the Defendant or without the Defendant's knowledge

___

statements at trial about the residency provision and that such statements "'prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial,'" United States v. Chong Lam, 677 F.3d 190, 203 (4th Cir. 2012) (quoting United States v. Chorman, 910 F.2d 102, 113 (4th Cir. 1990)), or that the Government relied on the violation of a civil statute to "ipso facto" supply an element of the criminal offense, such claims are denied for the same reasons discussed above.

at the direction of co-defendant Allison Hunter-Evans. The fact that Defendant testified at length during the trial and denied any involvement in criminal activity further highlights the critical credibility determinations that were before the jury.

In considering Defendant's motion based on the sufficiency of the evidence, the Court asks "'whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt.'" United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008) (quoting United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982)). The Court considers "both circumstantial and direct evidence, and allow[s] the government all reasonable inferences that could be drawn in its favor." Id. Any conflicts in the testimony or evidence, as well as credibility questions, are left for the jury to decide. Id.

As previously stated on the record, Defendant's arguments for judgment of acquittal are without merit as the Government presented sufficient evidence as to each of the offenses of conviction. Although Defendant's post-trial motion offers detailed arguments as to individual counts, the thrust of Defendant's arguments merely offer an alternative interpretation of the evidence. Defendant had every opportunity to present (and did present) such alternative interpretation to the jury at trial, but nothing in the post-trial motion supports Defendant's

contention that any count of conviction should be set aside based on the claimed insufficiency of the evidence.[20]  See <u>United</u>

---

[20] For example, as to Count Nine, Defendant argues in his post-trial brief that one of the Government's exhibits contained an error, and that after such error is corrected, the most reasonable interpretation of the evidence is not that Defendant committed fraud, but instead that a weekly timesheet was lost or misplaced.  Defendant, however, already appears to have addressed such matter in his closing argument, suggesting to the jury that the lack of a timesheet for the week in question is not indicative of fraud.  Regardless of the fact that there may be alternative plausible "innocent" explanations for some degree of inconsistencies between time billed to Medicaid and hours actually worked, such alternative reasonable interpretations are insufficient to undercut the reasonableness of the jury's verdict in the context of the facts of this case.  The Court will therefore not engage in post-trial speculation as to whether the absence of a timesheet for a specific week is the result of a mere clerical error, or the result of a fraudulent bill sent to Medicaid for hours that were never worked because the patient was in the hospital, or refused care, or fired her personal care aide.  Although the Government did not present <u>direct evidence</u> proving that care was not provided for the week in question as to Count Nine, the circumstantial trial evidence presents competing reasonable hypotheses, with the jury adopting the hypothesis that supports a finding of guilt.  <u>See</u> <u>United States v. Jackson</u>, 863 F.2d 1168, 1173 (4th Cir. 1989) (explaining that "circumstantial evidence is treated no differently than direct evidence, and may be sufficient to support a guilty verdict <u>even though it does not exclude every reasonable hypothesis consistent with innocence</u>" (citing <u>United States v. George</u>, 568 F.2d 1064, 1069 (4th Cir. 1978))) (emphasis added).  Such competing reasonable hypotheses are in contrast to a situation where a jury's verdict is based on internally inconsistent evidence, or evidence otherwise belied by the record.  <u>See</u> <u>United States v. Barker</u>, 967 F.2d 1275, 1277-78 (9th Cir. 1991) (reversing a conviction where the government's entire case rested on a "self-contradictory report" which was "contradicted on the vital point by all the other contemporary reports" and where there was "zero evidence" to support a finding that the defendant acted with the requisite mental state).  Here, the trial evidence providing the context for the offense charged in Count Nine demonstrates that Defendant, in direct conflict with his sworn testimony, knowingly and intentionally engaged in the long-term practice of billing Medicaid through a method that <u>ignored the timesheets</u> submitted by his employees on a week-by-week basis.  Accordingly, when presented with a specific instance where Defendant's company had no timesheet reflecting that care was provided to a given patient during a given week, yet Medicaid was billed as if care was provided for that entire week, it was reasonable for the jury to conclude that the absence of such timesheet was not merely an administrative "mistake," as

States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994) ("With respect to sufficiency of the evidence, [the court] must sustain the conviction if 'any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.'" (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979))) (emphasis in original). This Court has no doubts that, regardless of the precise contours of any specific civil Medicaid regulation, it is unlawful under the statutes of conviction to engage in an established practice of billing a government entity for home health care that was not provided, or for home health care that was provided for the sole purpose of increasing Medicaid billings in situations where such care was not requested or necessary. It is further readily apparent that Defendant was well-aware of the illegality of such acts. Primary care hours and respite care hours can plainly only be billed to Medicaid if such hours were actually worked. Moreover, Defendant was aware that it was unlawful to bill Medicaid for "respite care" hours that were provided without any regard to whether the "primary caregiver" needed relief, as such program is on no level

---

Defendant speculates, but was instead a discrete example of one of the scores of documented instances in the record of Defendant overbilling Medicaid due to his woefully inaccurate and intentionally fraudulent "plan of care" billing method. See Burks v. United States, 437 U.S. 1, 17 (1978) (indicating that although the case before the Court did not present the "occasion to re-examine in detail the standards for appellate reversal on grounds of insufficient evidence, it is apparent that such a decision will be confined to cases where the prosecution's failure is clear") (emphasis added).

designed merely to pad the bottom line of a home health care agency, but is instead expressly intended to provide a specific benefit to primary caregivers. Considering all the facts and reasonable inferences in favor of the Government, as this Court must do following a finding of guilt, there is sufficient evidence to support the convictions on the disputed counts.

The Court further finds that it is not in the interest of justice to grant a new trial based on the sufficiency of the evidence, as the Court does not consider any part of the jury's verdict as being against the weight of the evidence. See United States v. Wilson, 118 F.3d 228, 237 (4th Cir. 1997) (explaining that "a district court should exercise its discretion to grant a new trial 'sparingly' and . . . should grant a new trial based on the weight of the evidence "'only when the evidence weighs heavily against the verdict'" (quoting United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985))). Defendant's post-trial motion seeking judgment of acquittal or a new trial based on the claimed insufficiency of the evidence is therefore **DENIED**.

## IV. Conclusion

For the reasons provided above, the Court **DENIES** the Defendant's motions for a new trial and motion alternatively seeking a judgment of acquittal or a new trial. ECF Nos. 170,

172 and 173.    The Court will address the Government's pending motion for forfeiture by separate Order.

The Clerk is **DIRECTED** to send a copy of this Memorandum Order to defense counsel and to the Assistant United States Attorney assigned to this case.

**IT IS SO ORDERED.**

/s/ _____

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Va.
December 19 , 2014